## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-00285-WJM-NYW

KAREN NAKAYAMA, and
ROBERT BRIDGES,

      Plaintiffs,

v.

JENNIFER L. SANDERS, and
CODY K. SANDERS,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Defendants' Motion To Dismiss For Lack Of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) (the "Motion to Dismiss") [#20, filed March 6, 2017]. The undersigned considers the motions pursuant to 28 U.S.C. § 636(b)(1), the Order Referring Case dated January 31, 2017 [#5], and the Memorandum dated March 7, 2017 [#23]. Upon review of the Parties' briefing, the entire case file and applicable law, and the comments offered at the March 17, 2017 motion hearing, this court respectfully RECOMMENDS that the Motion to Dismiss be GRANTED.

## BACKGROUND

      Plaintiffs Karen Nakayama ("Ms. Nakayama") and Robert Bridges ("Mr. Bridges") (collectively, "Plaintiffs") initiated the instant matter on January 30, 2017. [#1]. Plaintiffs' Complaint seeks declaratory and injunctive relief, as well as the imposition of civil penalties

under the Federal Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7401 *et seq.* against Defendants Jennifer L. Sanders ("Ms. Sanders") and Cody K. Sanders ("Mr. Sanders") (collectively, "Defendants"). [*Id.* at ¶ 1]. Plaintiffs allege that Defendants' "chronic release of harmful air pollutants from a coal fired boiler owned and operated by them on their property, in La Plata County, Colorado" violates the CAA, the Colorado Air Pollution Prevention and Control Act ("CAPPCA"), Colo. Rev. Stat. § 25-7-101 *et seq.*, the regulations of the Southern Ute Indian Tribe/State of Colorado Environmental Commission (the "Environmental Commission"), and the respective federal and state implementing regulations, 40 C.F.R. Part 60 and 5 Colo. Code Regs. §§ 1001-1–1001-18. [*Id.*]. In addition, Plaintiffs levy several common law torts claims against Defendants for: (1) nuisance; (2) invasion of privacy by intrusion; (3) intangible trespass; and (4) intentional infliction of emotional distress ("IIED"). [*Id.*].

Plaintiffs are the owners of a 6.2-acre tract of land located at 12187 County Road 120, La Plata County, Colorado, and have lived there since December 17, 2001. [*Id.* at ¶ 6]. On or about March 20, 2012, Defendants received title to and have lived on an approximately 40.15-acre tract of land located at 12191 County Road 120, La Plata County, Colorado, which is adjacent to and east of Plaintiffs' property. [*Id.* at ¶ 7]. Both properties are located within the exterior boundaries of the Southern Ute Indian Reservation (the "Reservation").[1] [*Id.* at ¶ 5].

---

[1] "The Southern Ute Indian Reservation is located in southwest Colorado in the southern portions of La Plata and Archuleta Counties. Congress confirmed the boundaries of the reservation in the Act of May 21, 1984, Pub. L. No. 98-290, 98 Stat. 201, 202 []. The reservation encompasses approximately 681,000 acres, of which approximately 308,000 surface acres are held in trust by the United States for the benefit of the Tribe. . . . [T]he Reservation is a checkerboard of land ownerships, including: lands held in trust by the United States for the Tribe's benefit; lands held in trust by the United States for the benefit of individual tribal members; lands owned in fee by members of the Tribe; lands owned in fee by non-Indians; and National Forest lands." *See* Colo. Rev. Stat. § 24-62-101.

Approximately three years ago, Defendants installed a coal-fired boiler (the "boiler") on their property that emits coal combustion by-product into the air upon igniting, firing, and burning. [*Id.* at ¶ 8]. The boiler provides heated water to an in-floor heating system in Defendants' home. [*Id.* at 4].

Plaintiffs allege that the boiler's by-products are intrusive and medically harmful emissions, which includes smoke and odor that adversely affects Plaintiffs. [*Id.* at ¶¶ 9–10]. Plaintiffs allege that they have requested that Defendants use alternative fuel sources for the boiler, but to no avail, despite the fact that Defendants previously burned wood as the boiler's fuel source. [*Id.* at ¶10; *id.* at 5]. Plaintiffs continue that, because of these requests, Defendants have intentionally intruded, both physically and emotionally, upon Plaintiffs' seclusion and solitude, and that the boiler's emissions adversely affect Plaintiffs' property, residence, living space, as well as their lungs, eyes, noses, and mouths. [*Id.* at ¶ 11].

In addition, Plaintiffs allege that Defendants subject them to continued harassment and intimidation by

> exhibit[ing] a large flag on the shared property line depicting a fist with a raised middle finger, continu[ing] [to] shin[e] [] bright lights directed into Plaintiffs' home throughout the night, [the] plac[ing] of a pig sty adjacent to Plaintiffs' home (15' feet from Plaintiffs' garage and 60' feet from Plaintiffs' kitchen), and [from] the seepage of pig waste onto Plaintiffs' property with the accompanying odor.

[*Id.* at ¶ 12].

According to Plaintiff's, a December 30, 2016 observation and recordation of the boiler's opacity of emissions, revealed nine visible emissions with an average of 50-percent opacity and a minimum of 35-percent opacity—percentages that exceed regulatory opacity standards for coal-

fired industrial boilers.[2] [*Id.* at ¶ 15]. Plaintiffs allege that the prevailing winds carry the boiler's emitted fine particulate matter long distances, and that this particulate matter can cause serious health effects. *See* [*id.* at ¶¶ 16–20]. Accordingly, Plaintiffs allege that Defendants violated the Colorado Air Quality Control Commission's ("AQCC") regulations, the Intergovernmental Agreement between the Southern Ute Indian Tribe and State of Colorado Concerning Air Quality Control on the Southern Ute Indian Reservation (the "IGA"), and the CAA, because the boiler emits air pollutants in excess of twenty-percent opacity. *See* [*id.*at ¶ 42]. Plaintiffs do not allege any violation of a Tribal Implementation Plan or any federal regulations. *See generally* [#1].

On March 6, 2017, Defendants filed their Motion to Dismiss Plaintiff's Complaint. *See* [#20]. Defendants argue that the court lacks subject matter over Plaintiffs' CAA claim and, accordingly, lack supplemental jurisdiction over Plaintiffs' common law tort claims. *See* [*id.* at 2–3]. Plaintiffs opposed the Motion to Dismiss on March 13, 2017, and Defendants replied on March 16, 2017. Also on March 16, the Southern Ute Indian Tribe ("the Tribe") sought leave to file an amicus brief, which was not opposed by the Parties. [#28]. This court held oral argument on March 17, 2017, first granting leave to the Tribe to file its amicus brief, *see* [#30], and permitted the Parties as well as the Tribe to argue. The motion is now ripe for Recommendation.

---

[2] Plaintiffs explain, "In the air pollution context, percentage opacity is the degree to which the transmittance of light is reduced by air pollutants." [#1 at ¶ 28]; *see also* 5 Colo. Code Regs. § 1001-2:I.G. Plaintiffs also attach the Visible Emissions Observation Form completed by Wasteline, Inc. *See* [#2-2].

## LEGAL STANDARD

Federal courts are courts of limited jurisdiction and, as such, "are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction." *The Wilderness Soc. v. Kane Cty., Utah*, 632 F.3d 1162, 1179 n.3 (10th Cir. 2011) (Gorsuch, J., concurring). Indeed, courts have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party. *Image Software, Inc. v. Reynolds & Reynolds, Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)). Under Rule 12(b)(1), a court may dismiss a complaint for lack of subject-matter jurisdiction. Doing so is not a determination on the merits of the case; rather, it is a decision that the court lacks the authority to adjudicate the action. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). A court that lacks jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974); *accord Kennedy v. Lubar*, 273 F.3d 1293, 1301–02 (10th Cir. 2001) (holding that federal courts "must refrain from exercising jurisdiction unless we are certain that such jurisdiction has been granted us by Congress."). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *See Basso*, 495 F.2d at 909. Accordingly, Plaintiffs in this case bear the burden of establishing that this court has jurisdiction to hear their claims.

A motion to dismiss pursuant to Rule 12(b)(1) may take two forms: a facial attack or a factual attack. *Stuart v. Colo. Interstate Gas Co*., 271 F.3d 1221, 1225 (10th Cir. 2001); *Holt v.*

*United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). At oral argument, Defendants confirmed that they are proceeding with a facial attack of the Complaint. Facial attacks to subject matter jurisdiction question the sufficiency of the Complaint. *Holt*, 46 F.3d at 1002. "In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true." *Id.* Nevertheless, mere conclusory allegations of jurisdiction are insufficient. *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).

## ANALYSIS

## I.    Subject Matter Jurisdiction Under The CAA

Plaintiffs allege that the court has subject matter jurisdiction over their claims pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over their state law claims. [#1 at ¶ 2]. This court's subject matter jurisdiction depends on the interplay between the federal CAA, Colorado's environmental statutes, and the Environmental Commission's regulations. In addition, without subject matter jurisdiction pursuant to the CAA, this court lacks supplemental jurisdiction over Plaintiffs' state law claims. Thus, the court considers first whether subject matter jurisdiction exists under the CAA.

### A.    The CAA's Citizen Suit Provision

Under the CAA, "any person may commence a civil action on his own behalf . . . against any person . . . who is alleged to have violated . . . or to be in violation of (A) an emission standard or limitation under this chapter . . ." 42 U.S.C. § 7604(a)(1). The term "emission standard or limitation under this chapter" means, *inter alia*, "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard," or "any other standard, limitation, or schedule established . . . under any applicable State implementation plan

6

approved by the Administrator, . . ." *Id.* § 7604(f)(1), (4). A State Implementation Plan ("SIP"), submitted to the Administrator of the Environmental Protection Agency ("EPA"), is a state's plan as to how it will comply with the EPA's national ambient air quality standards ("NAAQS") and national ambient air quality secondary standards in each air quality control region within that state. *See* 42 U.S.C. § 7410(a)(1)–(3)(B). Should the SIP meet all applicable requirements, the Administrator will approve the SIP as promulgated.[3] *See id.* § 7410(k)(3).

## B.    The Tribal Authority Rule

As part of the 1990 amendments, the CAA authorized the Administrator to treat Indian "tribes as States" under the Act provided that the Indian tribe: (A) "has a governing body carrying out substantial governmental duties and powers" that (B) manages and protects air resources within the exterior boundaries of the Reservation, and that (C) is reasonably capable of carrying out such functions in a manner consistent with the CAA's provisions. *See id.* § 7601(d)(2)(A)–(C). This includes the approval or disapproval of Tribal Implementation Plans ("TIPs") under the same standards applicable to SIPs. *See id.* § 7601(d); *see also Adm'r, State of Ariz. v. U.S.E.P.A.*, 151 F.3d 1205, 1212 (9th Cir. 1998) (observing that the CAA defines the term "applicable implementation plan" to include TIPs promulgated under section 7601(d)). If approved, the TIP becomes applicable "to all areas [] located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation." 42 U.S.C. § 7410(o). Accordingly, a private citizen may avail itself of the CAA's Citizen Suit provision for violations of a TIP.

---

[3] The Administrator may also partially approve the SIP and direct the State to make appropriate revisions that are subject to further Administrator review. *See* 42 U.S.C. § 7410(k).

On February 12, 1998, the EPA issued a final rule specifying those provisions of the CAA for which it is appropriate to treat eligible tribes in a similar manner as states—the Tribal Authority Rule ("TAR"). *See* 63 F.R. 7254, codified at 40 C.F.R. § 49; *see also* 40 C.F.R. § 49.4 (listing CAA provisions for which it is not appropriate to treat tribes in the same manner as States). Should a tribe meet the eligibility requirements under the TAR, *see* 40 C.F.R. § 49.6(a)–(d), it can request a delegation of authority by the EPA to administer certain CAA programs, including even partial elements of a program. *Id.* § 49.7(c). The EPA then reviews the tribe's application and, if approved, the tribe will implement the program with the EPA retaining authority to impose sanctions for failure to implement the approved plan. *See* 59 F.R. 43,956 at 43965 (Aug. 25, 1994). In addition, the EPA retains concurrent jurisdiction over delegated programs, *see* 42 U.S.C. § 7661a(i); 40 C.F.R. § 70.10, and retains jurisdiction to implement programs within Indian reservations where there is no approved delegation of authority or TIP. 42 U.S.C. § 7601(d)(4); 40 C.F.R. § 49.11(a).

## C.    The Colorado Air Pollution Prevention and Control Act

The Colorado Legislature enacted the CAPPCA "to foster the health, welfare, convenience, and comfort of the inhabitants of the state of Colorado," by ensuring compliance with the EPA's NAAQS within the State. Colo. Rev. Stat. § 25-7-102. To achieve its stated purpose, the CAPPCA authorizes the AQCC to promulgate a comprehensive SIP that shall "meet all requirements of the federal act [the CAA]." *Id.* § 25-7-105(1)(a)(I).

As part of Colorado's SIP, the AQCC promulgated 5 Colo. Code Regs. § 1001-3:II.A.1 (the "opacity regulation"). The opacity regulation states,

> no owner or operator of a [stationary] source should allow or cause the emission
> into the atmosphere of any air pollutant that is in excess of 20% opacity. This

standard is based on 24 consecutive opacity readings taken at 15-second intervals for six minutes. The approved reference test method for visible emissions measurement is EPA Method 9 (40 CFR, Part 60, Appendix A (July, 1992)) in all subsections of Section II. A and B of this regulation.

5 Colo. Code Regs. § 1001-3:II.A.1. The AQCC defines "owner or operator" as any person, "who owns, leases, operates, controls, or supervises a stationary source." *Id.* § 1001-2:I.G. A "stationary source" is defined as "[a]ny building, structure, facility, equipment, or installation, or any combination thereof belonging to the same industrial grouping that emit or may emit any air pollutant subject to regulation under the Federal Act," located on the owner or operator's property or properties. *Id.* In addition, the AQCC defines "air pollutant" as "[a]ny fume, smoke, particulate matter, vapor, gas, or any combination thereof that is emitted into or otherwise enters the atmosphere, including, but not limited to, any physical, chemical, biological, radioactive" substance or matter, not including water vapor, steam condensate, or any other exempted emission under the CAA. *Id.* The opacity regulation, approved by the EPA, took effect in Colorado on October 2, 2005, and the final rule became effective on January 18, 2012, codified at 77 F.R. 2466. *See Region 8: EPA's Air Pollution State Implementation Plans*, EPA, https://yosemite.epa.gov/R8/R8Sips.nsf/Colorado!OpenView&Start=1&Count=30&Expand=1.3 #1.3 (lasted updated Mar. 8, 2017).

### D.    The IGA and the Environmental Commission

As discussed, the CAA treats Indian tribes as states, and a TIP is effective within the exterior boundaries of the tribal reservation. 42 U.S.C. § 7602(d)(2). On December 13, 1999, Colorado's General Assembly approved the IGA. *See* Colo. Rev. Stat. § 24-62-101. The purpose of the IGA is "to establish a single air quality program applicable to all lands within the exterior boundaries of the Southern Ute Indian Reservation []." *Id.*, art. I; [#1 at ¶ 26]. In doing

9

so, the Colorado General Assembly and the Tribe sought to alleviate jurisdictional disputes concerning the regulation of non-Indian air pollution sources on fee land within the boundaries of the reservation.  Colo. Rev. Stat. § 24-62-101, art. II.  Ultimately, the IGA's purpose is to receive federal authorization that the EPA may treat the Tribe as a state for purposes of the CAA.  *See id.*, art. I.

   To attain this goal, the IGA provides for three phases of implementation.  Colo. Rev. Stat. § 24-62-101, art. V.  First, during the Formation Phase, Colorado and the Tribe "will work cooperatively to administer and enforce an air quality program for the Reservation, as provided in Article IX."  *Id.*, art. V.A.  Further, Colorado and the Tribe will seek state legislation creating the Environmental Commission as well as an EPA delegation to the Tribe of CAA programs.  *Id.*  Next, during the Development Phase, the Environmental Commission "will determine which parts of the [CAA] or other air programs to incorporate into the Reservation Air Program, based on State or other regulations as modified by the [Environmental] Commission to address the particular local circumstances of the Reservation."  *Id.*, art. V.B.  In addition, the Environmental Commission will apply for delegations of those programs from the EPA.  *Id.*  Lastly, the Program Phase begins following the enactment of federal legislation recognizing the Tribe as a state under the CAA, and "after actual delegation of [CAA] Programs by the EPA."  *Id.*, art. V.C.

   The IGA provides further that, during the Formation and Development Phase, the Tribe will work with the EPA and allow EPA enforcement of CAA requirements for "sources located on trust lands and Indian sources located on fee lands within the Reservation."  Colo. Rev. Stat. § 24-62-101, art. IX, X.A.  Colorado, conversely, has jurisdiction to enforce its CAA programs and applicable air quality regulations as to non-Indian owned air pollution sources located on fee

lands within the Reservation in conjunction with the Tribe. *Id.* However, during the Program Phase, which is defined as "[f]ollowing the adoption of the federal legislation and EPA delegation of [CAA] programs contemplated by this agreement," "*the Tribe will exercise civil enforcement jurisdiction over any persons on all lands within Reservation boundaries for violations of the Reservation air quality program, subject to administrative review by the Commission.*" *Id.*, art. X.B.1. (emphasis added); *see also* Colo. Rev. Stat. § 25-7-1305.

Accordingly, in 2000, the Colorado General Assembly created the Environmental Commission pursuant to the IGA, and granted the Environmental Commission sole authority over the "air quality policy making" within the exterior boundaries of the reservation, including the sole authority to create and implement a TIP. *Id.*, art. VII; *see also* Colo. Rev. Stat. §§ 25-7-1301–1304. Notably, "*all* lands within the exterior boundaries of the reservation [are] subject to the authority of the [Environmental Commission] and the provisions of the reservation air program, . . . and [are] not subject to the authority of the [AQCC]." Colo. Rev. Stat. § 25-7-1301(2).

In 2004, Congress approved the IGA. *See* Act of October 18, 2004, Pub. L. No. 108-336, 118 Stat. 1354. Under § 4(a)(1), Congress "authorized [the Administrator of the EPA] to treat the Tribe as a State" for purposes of reviewing TIPs submitted pursuant to section 7601(d) of the Act. *Id.* Upon approval of a TIP by the Administrator, the TIP becomes applicable to "all air resources within the exterior boundaries of the Reservation," and is enforceable by the Tribe or any person pursuant to the CAA's Citizen Suit provision. *Id.* § 4(a)(2), (5)(a)–(b).

Pursuant to its authority, the Environmental Commission promulgated the Reservation Air Code ("RAC") that became effective March 2, 2012.[4]  *See Reservation Air Code*, The Southern Ute Indian Tribe/State of Colorado Environmental Commission, *available at* https://www.southernute-nsn.gov/reservation-air-code/.   On July 8, 2013, the EPA approved delegation to the Tribe to implement and enforce New Source Performance Standards ("NSPS") and National Emission Standards for Hazardous Air Pollutants ("NESHAP") under sections 111 and 112 of the CAA, respectively, and the final rule became effective on September 6, 2013.  *See id.*; *see also* [#26-3].   The Environmental Commission also intends to implement a permit program for minor sources as well as a pollutant-specific TIP; however, presently, there is no approved TIP, nor has EPA delegated authority to the Tribe or the Environmental Commission to regulate minor sources.  *See* [#26-3 at 5]; *see also Approved Air Quality Implementation Plans in Region 8*, EPA, https://www.epa.gov/air-quality-implementation-plans/approved-air-quality-implementation-plans-region-8 (last updated Oct. 5, 2016) (noting, "Region 8 [which includes Colorado and the Tribe] has no approved TIPs.").

### E.     Defendant's Motion to Dismiss

Plaintiffs' Complaint alleges that the court has subject matter jurisdiction over its CAA claim pursuant to the Citizen Suit provision of the Act.  [#1 at ¶ 2].  Specifically, Plaintiffs aver that Defendants violated the AQCC's opacity regulation and analogous regulations in the Environmental Commission's RAC.  *See* [*id.* at ¶¶ 15, 27, 37, 42].  According to Plaintiffs' Complaint, because the opacity regulation and its counterparts under the RAC constitute an "emission standard or limitation," as defined under the CAA's Citizen Suit provision,

---

[4] *See also* 77 F.R. 15267 (2012) (approving the Tribe's Title V permitting program).

Defendants' alleged violation of these regulations confers subject matter jurisdiction on this court pursuant to section 7604(a)(1) of the Act. *See* [*id.* at ¶¶ 2, 37, 42].

Defendants argue, however, that this court lacks subject matter jurisdiction over Plaintiffs' CAA claim because Plaintiffs' basis for jurisdiction rests on a Colorado state regulation that is inapplicable to Defendants. *See* [#20 at 7, 9]. Defendants assert that the implementation of the IGA is in the Program Phase, and because the Parties' properties are located within the exterior boundaries of the Reservation, the Environmental Commission, not the AQCC, has sole jurisdiction over any alleged air quality violations by Defendants. [*Id.* at 8–9]. Further, despite Plaintiffs' allegations to the contrary, there is no RAC regulation analogous to the opacity regulation, nor do Plaintiffs identify any specific RAC regulation allegedly violated. [*Id.* at 10]. Thus, the alleged violation of the opacity regulation, without more, does not confer subject matter jurisdiction on this court under the CAA. [*Id.* at 9, 10].

Plaintiffs respond that subject matter jurisdiction is proper in this court because the Tribe has yet to submit a TIP to the EPA; thus, "the EPA has not delegated to the Tribe the sole authority over all air programs within the exterior boundaries of the reservation." [#26 at 6, 9–10]. Accordingly, Plaintiffs contend that the implementation of the IGA is still in the Development Phase, that the Tribe and the State of Colorado share concurrent jurisdiction over land within the exterior boundaries of the Reservation, and that the State of Colorado regulations apply. In addition, Plaintiffs rely on two correspondences from Mark Huston, the Tribes Air Quality Program Manager, wherein Mr. Huston informs Plaintiffs that the Tribe and Environmental Commission do not regulate residential heating source emissions, and that Plaintiffs should seek civil recourse elsewhere. *See* [*id.* at 3; #26-1;#26-2]. Because of this,

Plaintiffs argue that the AQCC still has authority to enforce its regulations on any non-Indian owned source on fee land within the reservation. [*Id.* at 11 (quoting Colo. Rev. Stat. § 25-7-1305(2))]. According to Plaintiffs, the lack of any alleged violation of a specific RAC regulation does not divest this court of subject matter jurisdiction, as the opacity regulation is applicable to Defendants' boiler—a non-Indian source on fee land with the reservation. [*Id.* at 11–12].

In their reply, Defendants reiterate that the opacity regulation is inapplicable to the boiler because on March 2, 2012, the EPA approved the Tribe's TIP. *See* [#27 at 3]. In support, Defendants cite to 77 F.R. 15267 (2012) which codifies the EPA's approval of the Tribe's Title V Permitting Program. [*Id.*].

The Tribe's amicus brief explains in detail the regulatory authority it believes applies to the land within the exterior boundaries of the Southern Ute Tribe Reservation. [#31]. As part of that description, it discusses the three phases of the development of the RAC: (1) Formation Phase; (2) Development Phase; and (3) Program Phase. [*Id.* at 3]. The Tribe asserts that during the Formation and Development Phase, the State of Colorado agreed not to object to the Tribe's exercise of authority over Indians on all lands within the Reservation and over non-Indians on trust lands for violations of tribal air quality regulations, or direct EPA implementation of CAA requirements. [*Id.*]. Conversely, the Tribe agreed not to object to the State of Colorado's exercise of authority over non-Indians on non-trust lands for violations of State air quality regulations. [*Id.* at 3–4]. The Tribe disagreed with Defendants' contention that the Tribe had exclusive authority over air pollution control on the Reservation. [*Id.* at 4]. It also disagreed with Plaintiffs' contention that the State of Colorado retained any regulatory authority, because the IGA implementation is in the Program, not the Development, Phase and, accordingly, only

the Tribe and the EPA have any jurisdiction over air pollution from any source on the Reservation.  [*Id.* at 1–2].[5]

### i. Interpreting the IGA

Determining what regulations apply to air pollution within the exterior boundaries on the Reservation at this time, requires this court to interpret the applicable statute as well as answering what appears to be a matter of first impression within the State of Colorado. "[A]ccordingly, the Court applies Colorado state law regarding statutory construction in 'endeavoring to predict' how the Colorado Supreme Court would rule on this question." *Abercrombie v. Aetna Health, Inc.*, 176 F. Supp. 3d 1202, 1206 (D. Colo. 2016).

Under Colorado law, the principal task is to determine the statute's legislative intent. *Ward v. Allstate Ins. Co.*, 45 F.3d 353, 354 (10th Cir. 1994).  In doing so, courts look to the plain language of the statute—"reading words and phrases in context, giving effect to every word and rendering none superfluous, construing text according to the rules of grammar, and avoiding strained or forced interpretations."  *Kennett v. Bayada Home Health Care, Inc.*, 135 F. Supp. 3d 1232, 1241 (D. Colo. 2015) (citations omitted).  If the statute is unambiguous, the court's inquiry

---

[5] The Tribe proceeds to explain that the EPA has established standards of performance for residential wood heaters at 40 C.F.R. §§ 60.530-60.539b that might apply to Defendants. [#31 at 5].  Plaintiffs neither specifically identify the EPA regulation as a basis for their suit, nor argue it as a basis in their Response to the Motion to Dismiss.  *See* [#1, #26].  Similarly, this EPA regulation is not a basis for their Motion for Preliminary Injunction.  [#9].  As stated on the record during oral argument, the court has discretion to consider arguments raised only in an amicus curiae brief, but that discretion is only exercised in exceptional circumstances. *WildEarth Guardians v. Nat'l Park Serv.*, 804 F. Supp. 2d 1150, 1154 (D. Colo. 2011) (citing *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403–04 (10th Cir.1997), *aff'd*, 703 F.3d 1178 (10th Cir. 2013).  Given that the court's analysis on a facial attack of subject matter jurisdiction is confined to the operative Complaint, this court does not consider this argument raised by the Tribe.

stops and the court applies it as written. *Planned Parenthood of Rocky Mountains Servs. Corp. v. Owens*, 107 F. Supp. 2d 1271, 1282 (D. Colo. 2000) (citing Colorado Supreme Court cases).

However, if the statute is ambiguous, *i.e.*, capable of two or more interpretations that lead to different results, the court may resort to different tools of construction to ascertain the legislative intent. *State v. Nieto*, 993 P.2d 493, 501 (Colo. 2000). For example, courts must read and consider the statue as a whole and must interpret it to "give consistent, harmonious, and sensible effect to all its parts." *Id.* This includes a consideration of the entire statutory scheme. *Ryals v. City of Englewood*, 364 P.3d 900, 915 (2016).

Here, under the IGA, the Colorado General Assembly intended to "establish a single air quality program applicable to all lands within the exterior boundaries of the Southern Ute Indian Reservation." Colo. Rev. Stat. § 24-62-101, art. I. Moreover, it is unambiguous that the Environmental Commission will have sole authority to promulgate the Reservation Air Program's rules and regulations, *see id.*, art. VII, and that "all lands within the exterior boundaries of the reservation," including non-Indians on fee lands within those boundaries, will be subject to the authority of the Environmental Commission and the Reservation Air Program. *see* Colo. Rev. Stat. § 25-7-1301(2) (declaring that it is the Colorado General Assembly's intent that the Environmental Commission will have sole jurisdiction over all lands within the exterior boundaries of the Reservation so long as the IGA is in place, and that those lands "shall not be subject to the authority of the [AQCC]"); *id.* § 25-7-1301(3) ("To the extent the state has jurisdiction over non-Indians on fee lands within the exterior boundaries of the reservation, *it is the intent of the General Assembly* in enacting this part 13 that the commission shall exercise such authority for the purposes set forth in this part 13."). The operative question presented by

16

this instant Motion to Dismiss is *when* the Environmental Commission retains sole jurisdiction to promulgate such rules and regulations and *when* the Tribe retains sole civil enforcement jurisdiction over "*any person* on all lands" within the Reservation for violations of the Environmental Commission's rules and regulations.

Both Parties assume that the answers to these questions hinge on whether the EPA has approved the Tribe's TIP. Plaintiffs argue that, because the EPA has yet to approve any TIP that governs Defendants' boiler, the Colorado SIP and associated opacity regulation apply to non-Indian sources on fee lands pursuant to the IGA. [#26]. Conversely, Defendants argue that the EPA approved the Tribe's TIP on March 2, 2012, when it delegated authority to the Tribe to administer its Title V Permitting Program within the exterior boundaries of the reservation; thus, the State opacity regulation is inapplicable to Defendants because the Tribe has sole civil enforcement jurisdiction. *See* [#20; #27]. This court agrees with Plaintiffs that the EPA has yet to approve the Tribe's TIP; however, this fact is not determinative for the issues before the court.

As mentioned, the IGA provides for three phases during the implementation of the Reservation Air Program. The Parties agree that the implementation of the IGA is not in the Formation Phase. They, however, vigorously disagree as to whether implementation is in the Development or Program Phase. Plaintiffs contend that until a TIP is approved by the EPA and all programs under the CAA are delegated by the EPA to the Environmental Commission, the implementation remains in the Development Phase. Defendants contend that a TIP was approved with the approval of the Title V Permitting Program. The Tribe contends that the implementation is in the Program Phase, not because the approval of the Title V Permitting

Program constitutes a TIP, but because it was the actual delegation of a CAA program and not all programs need to be delegated before the Program Phase begins.

This court concludes, giving the words of the statute their plain and ordinary meaning, *see Kennett*, 135 F. Supp. 3d at 1241, that the IGA is currently within the Program Phase. The IGA defined the Development Phase as "the time period *after* enactment of the tribal and State legislation creating the [Environmental] Commission and its authority and *before* adoption of federal legislation and delegation by the EPA of *any* [CAA] programs." *Id.* § 24-62-101, art. V.B (emphasis added). Thus, the IGA unambiguously imposes three conditions in determining when the Reservation Air Program is in the Development Phase: (1) after the creation of the Environmental Commission, but (2) before the adoption of federal legislation authorizing the EPA to consider the Tribe as a state for purposes of CAA programs and (3) before the EPA delegates any CAA program to the Tribe. It is clear that conditions one and two are satisfied— the Environmental Commission exists and Congress has authorized the EPA to treat the Tribe as a state under the CAA. Further, the plain language of the IGA makes clear that the Development Phase ends with the delegation of any CAA program, regardless of whether a TIP has been approved by the EPA.

As an adjective, "any" means "one or some indiscriminately of whatever kind;" or "one, some, or all indiscriminately of whatever quantity;" or "unmeasured or unlimited in amount, number, or extent." *Any*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/any (last visited Mar. 16, 2017). Here, the ordinary, and most natural meaning of the term "any," as used under condition three, means "one, some, *or* all" CAA programs. Accordingly, the Development Phase transitions to the Program Phase upon the

creation of the Environmental Commission and *after* the adoption of federal legislation and *after* the delegation by the EPA of "one, some, or all" CAA programs to the Tribe.

Plaintiffs argue that the IGA's definition of the Program Phase as the "time period *after* enactment of federal legislation and *after* actual delegation of Clean Air Act Programs by the EPA" requires delegation of all CAA programs before the Program Phase begins. But the definition of the Program Phase does not include the adjective "all" preceding CAA programs. To read such an adjective into the definition of Program Phase would necessarily create an undefined gap following the delegation of a single CAA program (*i.e.*, after the Development Phase) but before the delegation of all CAA programs (*i.e.*, the beginning of the Program Phase). Courts, however, will not interpret statutes in a way that leads to an illogical or absurd result, *Frazier v. People*, 90 P.3d 807, 811 (Colo. 2004), and, instead, must consider the statue as a whole and must interpret it to "give consistent, harmonious, and sensible effect to all its parts," *Nieto*, 993 P.2d at 501.

Presently, the EPA has delegated at least two CAA programs, *i.e.*, Title V permitting, and NSPS and NESHAPs, to the Tribe, thereby satisfying the term "any" and placing the Reservation Air Program in the Program Phase. Accordingly, under the Program Phase, "the Tribe will exercise civil enforcement jurisdiction over any persons on all lands within Reservation boundaries for violations of the Reservation air quality program, subject to administrative review by the Commission." Colo. Rev. Stat. § 24-62-101, art. X.B.1. This comports with the IGA's legislative intent "to establish a single air quality program applicable to all lands within the exterior boundaries of the Southern Ute Indian Reservation." *Id.*, art. I.

Based on the foregoing, the opacity regulation is inapplicable to Defendants' boiler. Further, as Plaintiffs' Response indicates, neither the Environmental Commission nor the Tribe regulates minor source emissions. And, contrary to Plaintiffs' assertions, in the absence of a specific Environmental Commission regulation or Tribal delegation, it is the EPA, not the State of Colorado, who retains concurrent jurisdiction over such sources located within the exterior boundaries of the reservation. *See* 42 U.S.C. § 7601(d)(4); 40 C.F.R. § 49.11. Thus, Plaintiffs' Complaint fails to articulate a sufficient basis for exercising subject matter jurisdiction under the CAA's Citizen Suit provision, as Plaintiffs' alleged violation of an "emission standard or limitation" is inapplicable to Defendants' boiler located within the exterior boundaries of the reservation. *See* 42 U.S.C. §§ 7604(a)(1), (f)(4). The state law claims also do not provide any basis for federal court subject matter jurisdiction.

When a court concludes that it lacks subject matter jurisdiction, this is not a determination on the merits of the case, but only a decision that the court lacks the authority to adjudicate the action. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). If the court determines that it lacks subject matter jurisdiction over a claim, it may not consider any other issue. *See Cunningham v. BHP Petroleum Great Britain PLC*, 427 F.3d 1238, 1245 (10th Cir. 2005) (holding that once a federal court determines that it is without subject matter jurisdiction, it must not proceed to consider any other issue). Further, the court's subject matter jurisdiction is assessed at the filing of the original complaint, and cannot be conferred on the court through subsequent amendment. *Cf. S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (holding that the court must assess a

plaintiff's standing to bring suit at the time of filing her original complaint, even if she later amends that complaint). Consequently, this court RECOMMENDS that Defendants' Motion to Dismiss as to Plaintiffs' CAA claim be GRANTED. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216–17 (10th Cir. 2006) (recognizing that dismissal for lack of subject matter jurisdiction is without prejudice, because a court without jurisdiction cannot make any determinations on the merits of the underlying claim).

## II.    Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367

Defendants also argue for dismissal of Plaintiffs' state law claims, because without original jurisdiction over Plaintiffs' CAA claim, this court lacks supplemental jurisdiction over Plaintiffs' state law claims. [#20 at 10–11]. The court has discretion to exercise supplemental jurisdiction over Plaintiffs' state law claims. *Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013). However, to the extent that Plaintiffs intend to proceed on their state law claims against Defendants, it appears more appropriate for such claims to be adjudicated in a state court that is geographically proximate to all Parties. Accordingly, this court also RECOMMENDS that supplemental jurisdiction over Plaintiffs' state law claims be DECLINED, and that those claims be dismissed without prejudice. *See Tal v. Hogan*, 453 F.3d 1244, 1270–71 (10th Cir. 2006) (noting that it is well within the district court's discretion under 28 U.S.C. § 1367(c)(3) to decline to exercise supplemental jurisdiction over the plaintiff's state-law claims after dismissing her federal claims); *Schonebaum v. Shellpoint Mortg. Servicing*, No. 14-CV-03093-REB-KLM, 2016 WL 1104875, at *11 (D. Colo. Feb. 29, 2016) (declining to exercise supplemental jurisdiction over the plaintiff's state-law claims once the court dismissed plaintiff's federal claims).

**CONCLUSION**

Therefore, for the reasons stated herein, this court respectfully **RECOMMENDS** that:

(1)     Defendants' Motion to Dismiss [#20] be **GRANTED**;

(2)     Plaintiffs' Complaint [#1] be **DISMISSED without prejudice**; and

(3)     Plaintiff's Motion for a Preliminary Injunction [#9] be **DENIED AS MOOT**.[6]

Dated:  March 21, 2017                     BY THE COURT:


                                           s/ Nina Y. Wang_____
                                           Nina Y. Wang
                                           Unites States Magistrate Judge

---

[6] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).